UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CELIO ROMAN,                          ) <br>      Plaintiff                    ) <br>                             ) <br> v.                               ) <br>                             ) <br> THE HARTFORD AUTO GROUP, INC. d/b/a  ) <br> MAC MITSUBISHI and              ) <br> CREDIT ACCEPTANCE CORPORATION     ) <br>      Defendants               ) <br>                             ) | CIVIL ACTION NO. <br><br><br><br><br><br><br><br><br> JANUARY 27, 2020 |

## **COMPLAINT**

## I. **INTRODUCTION**

This is a suit brought by a consumer regarding the purchase and sale of a motor vehicle pursuant to a retail installment sales contract.  Plaintiff brings this action to recover actual damages, statutory damages, punitive damages, and reasonable attorney's fees and costs from Defendant The Hartford Auto Group, Inc. d/b/a Mac Mitsubishi ("HAG").  The Plaintiff claims that HAG violated the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* ("TILA"), Conn. Gen. Stat. § 52-565, the Connecticut Retail Installment Sales Finance Act, Conn. Gen. Stat. § 36a-770 *et seq.* ("RISFA"), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* ("CUTPA"), in the sale of the vehicle to Plaintiff. Plaintiff asserts claims against the finance company, Credit Acceptance Corporation ("CAC"), for benefitting from the forged instrument and as assignee of the retail installment sales contract.

## II. PARTIES

1.      Plaintiff, Celio Roman ("Plaintiff"), is a natural person residing in Hartford, Connecticut.

2.      Defendant HAG is a Connecticut corporation that operates a used car dealership in Hartford, Connecticut.

3.      Defendant Credit Acceptance Corporation ("CAC") is a Michigan corporation with a principal place of business in that state, and it is a finance company that accepts assignment of retail installment sales contracts.

## III. JURISDICTION

4.      Jurisdiction in this court is proper pursuant to 15 U.S.C. § 1640(e). Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

5.      This court has jurisdiction over HAG because it is organized under the laws of the state of Connecticut and it regularly conducts business in this state.

6.      This court has jurisdiction over CAC because it regularly conducts business in this state.

7.      Venue in this court is proper because the Plaintiff resides in Connecticut and the claims involve a transaction that occurred in Connecticut.

## IV. FACTUAL ALLEGATIONS

8.      Plaintiff is a Latinx man.

9.      The practice of car dealerships setting disadvantageous pricing and credit terms for racial minorities, women, and the young and old has been extensively studied

and persists within the industry even when dealerships undertake the conduct without explicit animus. *See Race and Gender Discrimination in Bargaining for a New Car;* Ian Ayres and Peter Siegelman, The American Economic Review, Vol. 85, No. 3. (Jun., 1995), pp. 304-321; *Imperfect Competition in Auto Lending: Subjective Markup, Racial Disparity, and Class Action Litigation*, Mark A. Cohen, The Journal of Law and Economics Vol. 8, No. 1 (2012), pp. 21-58.

10.     Research suggests that the dealerships' disparate treatment of women and racial minorities may be caused by dealers' statistical inferences about consumers' reservation prices.

11.     HAG engages in sales tactics wherein it targets women, racial or ethnic minorities, elderly persons and young people for discrimination with respect to the extension of credit and the setting of credit terms.

12.     HAG is a "creditor" as that term is defined by the Equal Credit Opportunity Act ("ECOA"). See 12 C.F.R. § 1002.2(l)*; Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 578 (6th Cir. 2016).

13.     HAG regularly participates in the credit decision through setting the terms of credit by, *inter alia,* setting the price of the vehicle, selecting which vehicle to sell, deciding whether or not to extend credit to customers for certain vehicles, and selecting the price for add-ons associated with the transaction.

14.     On information and belief, HAG also sets the interest rate for some or all of the vehicles it sells within limits prescribed by assignees.

15.     HAG's business practice is to "size up" customers and, for those perceived as vulnerable and gullible (known or previously known internally at HAG as

"ducks", as in the colloquialism "sitting ducks"), to charge them higher prices (relative to sophisticated buyers, or individuals it perceives to be sophisticated buyers), and to "pack" their contracts with extras of little value compared to their cost.

16.     HAG determines whether or not a customer is a "duck", in part, on the basis of whether or not a customer is a member of a protected class, such as a woman or a member of a racial or ethnic minority.

17.     HAG refers or has referred to buyers who appear sophisticated and informed, including many middle-aged, white men, as "beaters" and it does not attempt to take advantage of them with the above described sales tactics.

18.     HAG refers or has referred to Indian-American customers as "dots", presumably in reference to the Bindi worn by some Hindu and Jain women. When Indian-American customers come to HAG, the sales staff pretends to be busy and ignores them because of their perception that they are sophisticated customers and HAG will not be able to take advantage of them.

19.     HAG refers or has referred to Asian-American customers as "chinks", in reference to the slur used against Asian-Americans.  HAG's tactic with Asian-American customers is or was to increase the price of the vehicle, but then add digits associated with luck in Chinese numerology in order to entice the customer into the purchase.

20.     When HAG determines a customer to be a "duck", one frequently utilized tactic is to show that customer a single vehicle or very narrow group of vehicles on its lot and tell them that this is the only vehicle for which they are "approved", "qualified", or that it is the only vehicle available for them to purchase.

21.     HAG uses this tactic, because it allows it to off-load undesirable vehicles to "ducks", usually at prices far above their value.

22.     HAG will not permit that customer to apply for credit for other vehicles on the lot.

23.     It is the practice of HAG, when dealing with "ducks", to base the asking price for vehicles not upon the Manufacturer's Suggested Retail Price ("MSRP"), fair market in the National Auto Dealers Association ("NADA") guide or advertised price, but upon the maximum amount or nearly maximum amount for which a customer is approved for credit to purchase a vehicle.  It often removes all window stickers from the vehicle so that the customer has no idea what the advertised price or MSRP is for the Vehicle.

24.     Members of protected classes are considerably more likely to be characterized as "ducks" by HAG than the general public and, consequently, members of the protected classes are sold vehicles with grossly inflated prices and with financing arrangements obtained through fraud.

25.     Before October 19, 2019, Plaintiff was interested in purchasing a used truck and visited HAG's website, where he filled out a form that indicated that he was "approved" for financing at a rate of up to $500/month.

26.     Although he had ostensibly been approved for monthly payments of up to $500, Plaintiff believed that payments of that amount were outside of his budget and too expensive.

27.     Shortly after completing the credit application on HAG's website, a HAG representative who identified herself as "Chloe" telephoned Plaintiff.

28.     Chloe convinced Plaintiff to come to HAG, where she showed him a used 2018 truck.

29.     Chloe told him that this vehicle was in his price range, and Plaintiff was interested in that vehicle, but Chloe later advised that she was unable to find a finance company that would extend him credit for that truck.

30.     Plaintiff then spoke with another salesperson named Leo Kosikas ("Kosikas"), who told Plaintiff that a GMC Sierra had just entered the inventory of another HAG affiliate, Saybrook Buick GMC, in Old Saybrook, Connecticut.

31.     Kosikas showed Plaintiff an internet advertisement of a 2004 GMC Sierra (the "Vehicle"). The cash price of the Vehicle was $5,995.

32.     The Vehicle was in Plaintiff's price range, so he inquired about whether it had rust and its overall condition. Kosikas assured him that the Vehicle was in good condition, and Plaintiff was interested in the Vehicle.

33.     Kosikas created a sense of urgency and told Plaintiff that if he did not commit to the Vehicle soon, he might lose it.

34.     Plaintiff agreed to purchase the Vehicle, and he was presented with certain contract documents to sign at HAG's dealership in Hartford.

35.     Plaintiff only signed physical paper, and he did not electronically execute any documents.

36.     Kosikas then drove Plaintiff to the Old Saybrook location to take delivery of the Vehicle.

37.     Unbeknownst to Plaintiff, Kosikas increased the cash price of the Vehicle from the advertised price of $5,995 to $9,100.

38.     On information and belief, HAG increased the price because it sought to charge the highest possible price based upon the amount of credit Plaintiff was approved.

39.     On information and belief, HAG also increased the price, because discount finance companies, such as CAC, charge a fee or otherwise delay compensation when taking assignment of subprime or non-prime retail installment sales contract, and CAC did so here.

40.     Plaintiff was not provided with a copy of the Connecticut Department of Motor Vehicles Form K-208 evidencing the results of the mandatory safety inspection.

41.     Plaintiff paid a down payment and financed the remaining balance pursuant to a retail installment sales contract (the "Signed Contract").

42.     HAG, however, did not assign the physical retail installment contract that Plaintiff signed.  Instead, it forged Plaintiff's digital signature on a different contract (the "Forged Contract") that was assigned to CAC.

43.     The Forged Contract has different Truth in Lending Act Disclosures ("TILA") than the Signed Contract and a different schedule of payments.

44.     Plaintiff was not provided with a copy of the Forged Contract by HAG.

45.     Confused as to why he had a different due date for his monthly payments to CAC on his statement than on the Signed Contract, Plaintiff requested the installment contract that CAC possessed and was given the Forged Contract in mid November 2019.

46.     On or about December 9, 2019, Plaintiff informed CAC that it possessed a forged instrument. CAC signed for the certified letter informing it of this information on December 12, 2019.

47.     CAC has not responded to Plaintiff's letter and has continued to benefit from the forged instrument.

48.     The amount of the increased price attributed to CAC's discount fee was not disclosed as part of the finance charge in either the Signed Contract or the Forged Contract.

## V. CAUSES OF ACTION

### A.     TRUTH IN LENDING ACT

49.     HAG violated TILA, because it failed to provide Plaintiff with any of the disclosures required by 15 U.S.C. § 1638, because it failed to provide Plaintiff with a copy of the Forged Contract and did not otherwise provide him with the necessary disclosures of the terms of the Forged Contract.

50.     Additionally, HAG further violated TILA because the truth in lending disclosures on the Signed Contract were not accurate.

51.     Additionally, HAG further violated TILA because the increase to the cash price due to the discount charge should have been disclosed as part of the finance charge but was instead included as part of the amount financed.

52.     For HAG's TILA violations, it is liable to Plaintiff for actual damages, plus additional damages of $2,000, attorney's fees and costs.

## B.     CIVIL FORGERY

53.     HAG assigned the Contract to CAC with Plaintiff's unauthorized electronic signature.

54.     HAG has falsely made, altered, forged, or counterfeited the document and knowingly presented it as genuine to CAC, and it is liable to Plaintiff for double his damages pursuant to Conn. Gen. Stat. § 52-565.

## C.     CONNECTICUT RETAIL INSTALLMENT SALES FINANCE ACT

55.     HAG violated RISFA, Conn. Gen. Stat. § 36a-770 *et seq.* by not securing Plaintiff's signature on the Forged Contract and by not providing him with a copy.

56.     HAG's violations of RISFA were willful within the meaning of Conn. Gen. Stat. § 36a-786.

57.     CAC, after it had knowledge of the violations of RISFA, has retained the benefits, proceeds, profits, or advantages from the violation or otherwise has ratified the violation.

58.     Plaintiff is entitled to an order that CAC and HAG are barred from recovering any finance, delinquency, or collection charge on the Forged Contract pursuant to Conn. Gen. Stat. § 36a-786.

## D.     EQUAL CREDIT OPPORTUNITY ACT

59.     HAG violated the Equal Credit Opportunity Act ("ECOA") by charging Plaintiff a price based upon the maximum, or nearly maximum, amount for which Plaintiff was approved for credit instead of the fair market value of the Vehicle.

60.     HAG discriminated against Plaintiff as that term is defined by 14 C.F.R. § 1002(n), " treat[ing] an applicant less favorably than other applicants."

61.     But for Plaintiff's ethnicity, HAG would not have extended credit under these patently disadvantageous terms.

62.     The acts complained herein were done by HAG intentionally, purposefully and/or in reckless disregard of Plaintiff's rights.

63.     HAG is liable to Plaintiff for actual damages, punitive damages up to $10,000, attorney's fees and costs.

64.     CAC is liable to Plaintiff as assignee pursuant to Conn. Gen. Stat. § 52-572g and the terms of the Contract.

### E.     CONNECTICUT UNFAIR TRADE PRACTICES ACT

65.     HAG's actions as alleged above also violated CUTPA.

66.     Specifically, HAG's violated CUTPA through:

a.  Its business practice of unfairly targeting racial and ethnic minorities;

b.  HAG's refusal and failure to sell the Vehicle for the advertised price is a *per se* violation of CUTPA pursuant to Conn. Agency Reg. § 42-110b-28(b)(1).

c.  HAG's failure to provide Plaintiff with a copy of the K-208 form in violation of Conn. Gen. Stat. § 14-62(g), a *per se* CUTPA violation by operation of Conn. Agency Reg. § 42-110b-28(b)(23);

d.  HAG's forgery of Plaintiff's signature; and

e.  HAG's TILA, ECOA and RISFA violations.

67.     CAC also violated CUTPA through its violation of RISFA and its failure to take action after being informed that it held a forged instrument.

68.     As a result of HAG's conduct, Plaintiff suffered an ascertainable loss, including but not limited to that he overpaid for the Vehicle, he is making payments on a forged instrument, and was unable to make meaningful comparison of the terms of credit

69.     Plaintiff is entitled to actual damages of the amounts paid under the contract, punitive damages, and attorney's fees.

70.     CAC is liable for HAG's CUTPA violations as assignee pursuant to Conn. Gen. Stat. § 52-572g and the terms of the Contract.

Wherefore, Plaintiff claims actual damages, double damages, TILA statutory damages of $2,000, punitive damages, statutory punitive damages of $10,000, attorney's fees and costs, and an order that there is no finance charge collectible under the contract.  Plaintiff also seeks an order providing a refund of all interest payments made since CAC was informed of the forgery.

PLAINTIFF, CELIO ROMAN

By: _____

Daniel S. Blinn (ct02188)
Brendan L. Mahoney (ct29839)
Consumer Law Group, LLC
35 Cold Spring Rd. Suite 512
Rocky Hill, CT  06067
Tel. (860) 571-0408
Fax. (860) 571-7457
dblinn@consumerlawgroup.com
bmahoney@consumerlawgroup.com